# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| JUDY A. FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:11 C 01216 |
| | ) | Judge Marvin E. Aspen |
| SPRING MEADOWS HEALTH CARE | ) | |
| CENTER, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Judy Foster claims that she was terminated from her employment with

Defendant Spring Meadows Health Care Center, LLC ("Spring Meadows"), in violation of Title

VII and the Age Discrimination in Employment Act ("ADEA"). Presently before us is Spring

Meadows' motion for summary judgment. For the reasons set forth below, we deny the motion

in its entirety.

## BACKGROUND[1]

Spring Meadows is a long-term care facility located in Clarksville, Tennessee. (Def.'s

Facts ¶ 1.) Foster is an African-American woman, who was over the age of forty at all relevant

times. (*Id.* ¶ 40; Foster Dep. at 5, 108.) Foster worked at Spring Meadows as a certified nursing

aide ("CNA") for a total of approximately ten years, most recently from 2002 through

October 2009. (Def.'s Facts ¶¶ 2–3, 35–37; Foster Dep. at 17–19.) Foster has been certified as a

---

[1] Unless otherwise noted, the facts described herein are undisputed and culled from
Spring Meadows' Local Rule 56.01(b) statement of facts and the parties' exhibits. Foster
declined to offer additional statements of fact in support of her opposition to the pending motion.
Nonetheless, we will consider any material facts included in her brief where supported by record
citations.

CNA since 1990. (Foster Dep. at 15.) In her August 12, 2007 evaluation, Foster received a score of 360 points, out of a possible 400, indicating that her performance as a CNA was good. (Keith Smith Dep. at 78–80 & Ex. 40.) Foster was disciplined on February 25, 2007 for engaging in an altercation with coworkers in a public area and refusing to take the argument elsewhere when requested by her supervisor. (Foster Dep. at 73–78 & Exs. 7–8.) Foster testified that the February 25, 2007 write-up, which she voluntarily signed, was the only discipline she received during the course of her employment at Spring Meadows prior to the incident giving rise to her termination. (*Id.* at 74–78.) While at Spring Meadows, Foster worked two twelve-hour shifts per week, on Saturdays and Sundays. (Def.'s Facts ¶ 6.)

On Saturday, October 24, 2009, Foster worked her usual shift. (*Id.* ¶ 7.) The ward clerk, Jackie Adams, called Foster from the other wing at Spring Meadows to ask if Foster would volunteer to leave early due to overstaffing. (*Id.* ¶ 8; Foster Dep. at 19–20, 23–24.) This request was a common occurrence. (Foster Dep. at 19–20, 23–24, 28–29, 32–33, 35–36, 45; Barbie Henderson Dep. at 9.) Spring Meadows made staffing adjustments on a daily basis depending on the census (or number) of residents in the facility and the number of staff reporting for work. (Def.'s Facts ¶¶ 9–10, 20, 23.) Spring Meadows had a policy in place governing staffing adjustments. (*Id.* ¶ 11.) Generally speaking, the policy required that, in the event of a low census, sick employees would leave first, followed by employees with overtime, followed by "as needed" employees. (*Id.* ¶¶ 12–16.) If no sick, overtime or "as needed" employee qualified to go home, the Spring Meadows' supervisor would request volunteers. (*Id.* ¶ 17.) If no CNAs volunteered to leave, the supervisor would choose someone to leave who has not yet gone home early, taking turns fairly. (*Id.* ¶ 19.) If more than one employee volunteered to leave, the

-2-

supervisor must draw names to determine which CNA leaves early.  (*Id.* ¶ 18; *see also* Foster

Dep. at 44–50 & Ex. 3 (guidelines for staffing adjustments).)

Foster testified, however, that Spring Meadows did not follow this procedure during the

years of her employment.  (Foster Dep. at 48–49, 52–53, 55–57, 60–61.)  Foster stated, for

example, that she had never seen names drawn if more than one CNA volunteered to leave.  (*Id.*

at 52–53, 55–57.)  Barbie Henderson, another CNA who worked with Foster, also testified that

supervisors were not following the Spring Meadows guidelines at that time.  (Henderson Dep.

at 6–7, 25–29.)  She testified that, during the relevant time period, the supervisors did not comply

with the policy, instead picking and choosing who they felt should leave when they needed

volunteers.  (*Id.* at 25–29).

On Saturday, October 24, 2009, two CNAs were not needed due to the low census.

(Foster Dep. at 28, 40.)  At that time, Foster was one of six CNAs who had not yet agreed to

leave a shift early.  (Foster Dep. at 24–25; Henderson Dep. at 6–7.)  Foster informed Adams that

she did not wish to leave early that day.  (Def.'s Facts ¶ 24.)  Instead, Foster volunteered to leave

early the following day, Sunday, October 25, 2009.  (*Id.* ¶ 25.)  According to Foster and

Henderson, Adams told Foster that would be okay and that she should confirm with Linda

Adcock, Foster's supervisor.  (Foster Dep. at 34–39, 53; Henderson Dep. at 7–11.)  When

Adcock arrived later on October 24, Foster explained the situation and Adcock indicated it would

be fine for Foster to leave early on October 25 if there were no problems.  (Foster Dep. at 20,

53–54, 56, 66, 92–93, 96, 127; Def.'s Facts ¶¶ 26–27.)  The factors that would affect Foster's

ability to leave early included whether Spring Meadows saw an increase in the number of

patients and/or whether other CNAs called out or otherwise failed to report for work.  (Foster

-3-

Dep. at 25–26, 38–40.)

On Sunday, October 25, Foster arrived at Spring Meadows and began caring for a resident. (Def.'s Facts ¶ 28.) Foster testified that, like the day before, two scheduled CNAs would not be needed. (Foster at 28–29, 55, 64–65, 91.) While Foster was helping the resident, another CNA informed her that Andrew Lynch, a Spring Meadows nurse, was drawing names for people to go home.[2] (Foster Dep. at 50, 55, 60–65; Def.'s Facts ¶ 29.) Foster did not attend the drawing, and her name was not selected. (Def.'s Facts ¶ 30.) Nonetheless, Foster told Henderson and their charge nurse, Patricia Lambert, that she was leaving and clocked out. (Foster Dep. at 29–31, 41–42.) Henderson testified that Foster clocked out and that no one objected because they knew she had volunteered to do so. (Henderson Dep. at 10–11, 24.)

Shortly thereafter, a coworker told Foster that Spring Meadows considered her to have walked out. (Foster Dep. at 65.) Accordingly, Foster went to Spring Meadows the next day, October 26, 2009, and met with the Director of Nursing, Michelle Crowe, to explain and discuss what had happened. (*Id.* at 65; Def.'s Facts ¶ 32.) Crowe told Foster that she would conduct an investigation, consult Keith Smith, the Spring Meadows administrator, and then get back to Foster. (Def.'s Facts ¶ 33; Foster Dep. at 66–67.) Crowe said she thought it was a big misunderstanding and that Foster should return on Wednesday. (Foster Dep. at 66–67.) Crowe obtained written statements from Adams, Lambert, and Adcock as part of her investigation, all of

---

[2] Both Foster and Henderson testified that they suspected Lynch—who was not a supervisor and did not handle such matters—arranged for a drawing because he wanted his girlfriend, a CNA, to have the day off. (Foster Dep. at 52–53, 55, 61–62, 126; Henderson Dep. at 33–34.)

-4-

which suggested that Foster had directly disobeyed her supervisors.[3] (Def.'s Facts ¶ 34; Foster

Dep. at 67, 84–103.) Henderson testified that Crowe spoke with her about the incident.

Henderson told Crowe that she heard Adams tell Foster that she could leave on Sunday and that

Lambert knew of Foster's plan because she also overheard the conversation. (Henderson Dep. at

12–13, 23–24, 32.) Spring Meadows did not ask Henderson for a written statement of the events.

(*Id.* at 12.)

When Foster met again with Crowe on Wednesday, October 28, 2009, Crowe presented

her with a write-up. (Foster Dep. at 67 & Ex. 5 (10/28/09 Employee Counseling/Disciplinary

Mem.).) They reviewed the write-up, which stated that Foster: (1) left without approval, in

violation of Spring Meadows' policy on conduct and behavior; (2) exposed the residents to harm

by not telling anyone she was leaving, triggering certain "state tags"[4]; and (3) committed her

third act of insubordination. (Foster Dep. at 67–80 & Ex. 5; Def.'s Facts ¶ 37.) According to the

write-up, "[p]olicy states termination is necessary." (Foster Dep., Ex. 5.) Crowe informed Foster

that she was being terminated, although the write-up also notes that "[Foster] is considered to be

self-quit since she walked-out while on shift." (*Id.*) Foster refused to sign the write-up. (Foster

Dep. at 67, 71.)

On November 13, 2009, Foster sent a letter to the EEOC, complaining that Spring

Meadows fired her because she is African-American. (Foster Dep., Ex. 6.) She then filed a

---

[3] Foster testified that the statements provided by Adams, Lambert, and Adcock include numerous falsities. (Foster Dep. at 86, 90, 93, 96–98, 101–03.)

[4] The parties have not explained the "state tags" identified but they appear to describe types of dangerous or unacceptable conditions potentially caused by an employee's conduct. Here, the state tags refer to "abuse/neglect," "quality of care," "incontinence," "wounds/pressure sores," and "accidents/supervision." (Foster Dep., Ex. 5.)

-5-

charge of race and age discrimination with the EEOC against Spring Meadows on November 21, 2009. (Foster Dep., Ex. 4.) Foster contends that she was disciplined more severely than three younger, white CNAs who engaged in the same type of conduct. Spring Meadows disputes this allegation, which we shall address in detail below.

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); *see also DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (describing the issue as "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that on party must prevail as a matter of law") (internal quotation omitted). This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Amini v. Oberlin Coll.*, 440 F.3d 350, 357 (6th Cir. 2006) (internal quotation omitted). In deciding whether summary judgment is appropriate, however, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513; *see*

-6-

*Clayton v. Meijer, Inc.*, 281 F.3d 605, 609 (6th Cir. 2010).

## ANALYSIS

**I.     Prima Facie Case of Race and Age Discrimination**

Foster proceeds with her disparate treatment claims for race and age discrimination using the indirect method of proof, as articulated first in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).  Under the indirect method, the plaintiff must establish a prima facie case of discrimination, which requires proof that: (1) she is a member of a protected class; (2) her job performance met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) at least one similarly-situated employee not in her protected class was treated more favorably.  *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824; *DiCarlo*, 358 F.3d at 414–15 (noting that the burden-shifting *McDonnell Douglas* framework applies equally to ADEA claims); *see Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 317 (6th Cir. 2007); *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).  If the elements are established, discrimination is inferred and the burden of production shifts to the defendant to raise a legitimate, nondiscriminatory reason for the adverse action.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S. Ct. 1089, 1093 (1981); *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S. Ct. at 1824; *DiCarlo*, 358 F.3d at 414–15; *Tuttle*, 474 F.3d at 317.  Once a legitimate reason is offered, the inference of discrimination disappears, and the plaintiff must establish that the offered reason is a pretext for unlawful discrimination.  *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093; *DiCarlo*, 358 F.3d at 414–15; *Tuttle,* 474 F.3d at 317.  Here, there is no question that Foster satisfies the first and third prongs of the indirect method.  (Mem. at 6 (conceding that Foster falls within a protected class and that her termination was adverse).)  We

-7-

turn then to address the remaining disputed elements.

### A.    Foster's Qualifications

Spring Meadows contends that Foster was not meeting its legitimate expectations as of the date of her termination because of the October 25, 2009 incident.  (Mem. at 6.)  As Foster points out, Spring Meadows misunderstands our role at this stage.  "For purposes of the prima facie case analysis, a plaintiff's qualifications are to be assessed in terms of whether he or she was meeting the employer's expectations *prior to and independent of* the events that led to the adverse action." *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 573 (6th Cir. 2006) (emphasis added); *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 585 (6th Cir. 2002); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2000).  Indeed, we specifically "may not consider a defendant's justification for an adverse employment action when evaluating the plaintiff's evidence" of her job performance, which we credit.  *Miller v. Firstar Bank, N.A.*, 111 F. App'x 796, 800 (6th Cir. 2004); *Cline*, 206 F.3d at 660–61; *Quinn-Hunt v. Bennett Enters., Inc.*, 211 F. App'x 452, 457 (6th Cir. 2006).  We may rely on a defendant's justification and supporting evidence only "at the second and third stages of the *McDonnell Douglas* inquiry." *Quinn-Hunt*, 211 F. App'x at 457; *Cicero*, 280 F.3d at 585.

Accordingly, we may not yet evaluate Spring Meadows' rationale for its decision to terminate Foster due to her leaving work on October 25, 2009.  Rather, we consider the evidence Foster has submitted demonstrating her qualifications.  The record before us shows that Foster has been certified to work as a CNA since 1990 and has many years of experience in that position.  The only evaluation in the record of her performance at Spring Meadows indicates that she was a good employee.  (Keith Smith Dep. at 78–80 & Ex. 40.)  Although Spring Meadows

-8-

disciplined Foster for one isolated incident in February 2007, the record reveals no other

problems with her performance, attendance or behavior throughout her roughly ten years of

employment.  Accordingly, we find that Foster has satisfied this second element of the

*McDonnell Douglas* prima facie case.

### B.    Similarly-Situated Employees Outside the Protected Class

As for the fourth element, Foster must present evidence of similarly-situated, non-

protected employees who were treated more favorably under like circumstances.  *Tuttle*, 474 F.3d

at 318; *Clayton*, 281 F.3d at 610.  "To satisfy the similarly-situated requirement, a plaintiff must

demonstrate that the comparable employee is similar 'in all of the *relevant* aspects.'"  *Martin v.*

*Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (quoting *Ercegovich v.*

*Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)) (emphasis in original);

*Clayton*, 281 F.3d at 611.  The Sixth Circuit has held that, in a disciplinary context, the plaintiff

must show that she and "the proposed comparator have engaged in acts of comparable

seriousness."  *Clayton*, 281 F.3d at 611 (quotation omitted); *Colvin v. Veterans Admin. Med.*

*Ctr.*, 390 F. App'x 454, 458 (6th Cir. 2010); *Dickens v. Interstate Brands Corp.*, 384 F. App'x

465, 468 (6th Cir. 2010).  In making this assessment we must consider certain factors, including

whether the coworkers "have dealt with the same supervisor, have been subject to the same

standards and have engaged in the same conduct without such differentiating or mitigating

circumstances that would distinguish their conduct or the employer's treatment of them for it."

*Ercegovich*, 154 F.3d at 352; *Martin*, 548 F.3d at 411; *see also Mitchell v. Toledo Hosp.*, 964

F.2d 577, 583 (6th Cir. 1992).

That being said, a plaintiff "need not demonstrate an exact correlation with the employee

Case 3:11-cv-01216   Document 40   Filed 03/06/13   Page 9 of 22 PageID #: 681

receiving more favorable treatment in order for the two to be considered similarly-situated."
*Ercegovich*, 154 F.3d at 352 (quotation omitted); *Martin*, 548 F.3d at 412; *Clayton*, 281 F.3d at 611. "Exact comparators are often hard to come by, and whether any two employees are similarly situated often presents a question of fact for the jury." *Moore v. City of Clarksville*, No. 10 C 141, 2011WL 2938759, at *6 (M.D. Tenn. July 19, 2011); *see also Bobo v. UPS*, 665 F.3d 741, 753 (6th Cir. 2012) ("Discrimination cases frequently turn on whether the plaintiff can identify one or more comparators . . ."). The *McDonnell Douglas* "prima facie showing is not intended to be onerous," *Martin*, 548 F.3d at 412, and we should not grant summary judgment on this critical issue "if a reasonable jury could find that the named comparators were similarly situated," *Moore*, 2011WL 2938759, at *6.

Here, Foster identifies three white CNAs under the age of forty, who allegedly engaged in similar conduct but were not terminated: Sherry Green, Sara Hughes, and Jamie Vokelich. (Resp. at 12–13, 19–25.) The parties do not dispute that these women shared the same job title and duties as Foster and were subject to the same standards and policies. The parties also do not dispute that these coworkers had the same supervisors, including Crowe among others who were responsible for disciplining all three of them.[5] (*See* Mem. at 8–10 (challenging only Foster's claim that these employees engaged in similar conduct).) We turn then to evaluate whether any of these three individuals engaged in conduct comparably serious to Foster's walking out on October 25, 2009.

---

[5] The disciplinary forms in the record show that Crowe was not the only individual to counsel Green, Hughes, and Vokelich. Since the parties do not raise this issue, however, we need not address it. We add only that Keith Smith approved all of the relevant discipline.

-10-

### 1. Sherry Green

We begin with Sherry Green. On August 8, 2009, Green arrived for a shift at Spring Meadows. Rather than clock in, she sat outside for an hour smoking cigarettes with other employees. (Foster Dep. at 113–15; Smith Dep., Ex. 33 (Green Counseling Mem.).) When Green's supervisor for that shift asked if she was going to clock in, Green replied "no" and rejected her assignment. She then got in her car and left. (Foster Dep. at 115; Smith Dep., Ex. 33.) On August 10, 2009, Crowe presented Green with a write-up and a 12-hour suspension due to this incident, which appears to be her first discipline at Spring Meadows. In the write-up, Crowe faulted Green for leaving Spring Meadows without telling her supervisor if she was sick or had personal reasons for doing so. (Smith Dep., Ex. 33.) Crowe indicated that Green's unauthorized leaving violated Spring Meadows' policy on conduct and behavior and triggered certain state tags. (*Id.*) Crowe instructed Green to call in two hours ahead of her shift if she was sick and, if there was another need for her to leave a shift, to inform her supervisors for approval. (*Id.*)

Spring Meadows contends that Green's conduct is not similar to Foster's because Green did not clock in before leaving the facility. (Mem. at 9.) We find this distinction dubious. While not identical, this conduct is comparable to Foster's in all relevant aspects. Both women came to work for a scheduled shift as CNAs and then left, purportedly without approval. Both women were reprimanded for leaving without authorization and for failing to sufficiently communicate with their supervisors. (Smith Dep. Exs. 33–34.) Crowe informed both women that their behavior violated the policy on conduct and behavior and implicated five state tags—the *exact same* state tags—for potentially compromising resident care. (*Id.*) Based on the

-11-

record before us, particularly the disciplinary memoranda prepared by Crowe, a reasonable jury could easily conclude that Green's and Foster's conduct was comparably serious.

Spring Meadows also argues that Green and Foster were not similarly situated because Foster had a prior disciplinary warning in her file. (Mem. at 9.) "Differences . . . in disciplinary history may establish that two employees are not similarly situated." *Campbell v. Hamilton Cty.*, 23 F. App'x 318, 325 (6th Cir. 2001). This argument may ultimately prove persuasive. But on the record before us, Spring Meadows' position raises more questions about Spring Meadows' treatment of Foster than it answers. First, Foster has raised material questions of fact about the write-up from the incident occurring in February 2007. Foster's personnel file includes two write-ups for that same offense, one dated February 25, 2007 and another dated March 2, 2007. (Foster Dep., Exs. 7–8.) She signed the form dated February 25, 2007 and apologized for her conduct. The supervisors present for that counseling did not sign that form. Rather, an entirely different set of supervisors signed the March 2, 2007 form, which includes different notations. Most significantly, the March 2, 2007 form states that Foster would be terminated for "any other issues." (Foster Dep., Ex. 8.) Foster testified that she had not see the March 2, 2007 write-up until her deposition and was not aware of the note that she would be terminated for "any other issues." (Foster Dep. at 75–78.) Smith could not explain why Foster's file included two different counseling forms for the same incident. (Smith Dep. at 26–28.) The record also does not indicate if Crowe relied on both 2007 forms at the time she determined that Foster should be terminated more than two years later. A reasonable jury could question Spring Meadows' handling of this discipline, as well as how it affected Spring Meadows' response to the October 25, 2009 incident.

-12-

Second, Spring Meadows relatedly has not explained why Foster's write-up for the October 25, 2009 incident states that it is her third discipline for insubordination, requiring her termination. The October 28, 2009 write-up states: "This behavior is not acceptable at any time. Also, 3rd counseling for insubordination. Policy states that termination is necessary." (Smith Dep., Ex. 34.) This language raises several material questions of fact. For example, no policy in the record dictates that termination would be necessary after three incidents of insubordination.[6]

Additionally, Foster disputes the facts underlying this characterization of her disciplinary history. Foster admitted to the February 2007 offense and testified that she had no other disciplinary issues. (Foster Dep. at 74–78.) Yet her personnel file included a write-up dated July 18, 2009 for failure to follow procedures regarding approval for time off. (Smith Dep., Ex. 4.) The July 18, 2009 write-up states that Foster submitted a request for time off without obtaining approval for the employee she recruited to cover her shift. (*Id.*) Although the write-up says that Foster "refused to sign," the record suggests she never knew about it. (*See* Foster Dep. at 74–78.) The record further suggests that this request for time off may actually have been approved. (Smith Dep. at 29–30.) Smith testified that his initials appear on the request form as approving the time off, that he wasn't sure of the circumstances, and that didn't know the whole story. (*Id.* & Ex. 5 (request sheet completed by Foster with all necessary information and

---

[6] This finding does not mean that Spring Meadows did not have the right to fire Foster for insubordination. Rather, the notation simply doesn't appear accurate based on the information before us, thus raising questions about which policy Crowe had in mind and how she determined that termination would be necessary after any particular number of incidents. Indeed, Smith testified that it was Crowe's position—but not Spring Meadows policy—that Foster should be terminated. (Smith Dep. at 68.) Foster testified, however, that Crowe told her she believed the situation was simply a big misunderstanding, further calling Crowe's decision making into question. (Foster Dep. at 66–68.)

-13-

approved by Smith and Foster's direct supervisor).) The July 18, 2009 write-up does not characterize the alleged misconduct as insubordination, though Crowe may have treated it as such if she considered this discipline when deciding to terminate Foster. (Smith Dep., Ex. 4.)

Additionally, to the extent that Crowe deemed Foster's October 25, 2009 behavior as insubordination, the record does not explain why Green's similar, unauthorized refusal to work would not also constitute insubordination. Green was not cautioned, like Foster, that such behavior was unacceptable at any time. Instead, she was reminded to call in when sick and ask permission to leave under other circumstances. (Smith Dep., Exs. 33–34.)

Although Foster had one prior disciplinary warning in her file from 2007 when she left Spring Meadows while Green did not, we cannot hold as a matter of law that they are not similarly situated. We cannot determine whether Foster's prior discipline constitutes the type of "differentiating or mitigating circumstances that would distinguish" her conduct and Spring Meadows' treatment of her more than two years later. *Ercegovich*, 154 F.3d at 352; *Martin*, 548 F.3d at 411. Construing the record before us in Foster's favor, as we must, there are material questions of fact concerning whether Green and Foster are similarly situated in all relevant respects. Only a jury may resolve these open questions, particularly because they may turn on witness credibility. *Moore*, 2011WL 2938759, at *6; *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010) (explaining that a judge ruling on summary judgment may not weigh evidence or assess credibility); *see also Alspaugh v. McConnell*, 643 F.3d 162, 168 (6th Cir. 2011).

        2.    **Sara Hughes and Jamie Vokelich**

Foster contends that Hughes and Vokelich are also similarly situated to her because of their attendance problems. The record shows that both Hughes and Vokelich repeatedly violated

-14-

Spring Meadows' attendance control policy by failing to appear for scheduled shifts. (*See generally* Smith Dep. at 33–63, Exs. 6–31.) Hughes' file contains ten disciplinary forms, in which she was counseled for absenteeism on numerous dates from January 2008 through April 2010. (Smith Dep., Exs. 6–9, 12–17.) Vokelich's file includes six such disciplinary forms, covering dates from August 2007 through February 2010. (Smith Dep., Exs. 26–31.)

Nonetheless, we agree with Spring Meadows that Hughes' and Vokelich's attendance problems are not comparable to the conduct that led to Foster's termination. Hughes and Vokelich were disciplined pursuant to Spring Meadows' attendance control policy, found in the employee handbook. (Smith Dep. at 82–89 & Ex. 1.) Smith testified about the details of this policy, which allows up to eight unexcused absences during a rolling twelve-month period. (Smith Dep. at 83 & Ex. 1 at 15–16.) Employees can also reduce the consequences for attendance violations by picking up extra shifts as needed. (Smith Dep. at 84.) According to Smith's uncontroverted testimony, Hughes and Vokelich were disciplined for their absenteeism specifically under the attendance control policy. (*Id.* at 84–87; *see also id.* at 33–63, Exs. 6–31.) Foster was not disciplined for violating the attendance control policy, however, distinguishing her from those who were so disciplined.[7]

_____

[7] We also perceive a slight but meaningful distinction between failing to show up for work as scheduled in a timely fashion and leaving without prior authorization. First, Spring Meadows cannot rely on absentee employees, like Hughes and Vokelich, to complete assignments when they have not appeared for work. But Spring Meadows' staff and residents can rely on employees who have appeared for work and can expect them to continue providing care. Foster and Green, who abandoned their duties, thus appear differently situated from Hughes and Vokelich, who failed to show up entirely. Second, absenteeism seems less likely to rise to the level of "insubordination" than the conduct exhibited by Green and Foster, i.e., knowingly leaving work when scheduled without authorization. (The record does not indicate what Spring Meadows deems "insubordination," if anything beyond the common understanding.) We need not rely on these distinguishing features in light of the holding above.

To the extent that Crowe decided to terminate Foster for insubordination generally (as opposed to the single, specific incident of leaving work without permission), Hughes may qualify as similarly situated due to other discipline in her history. In addition to her many infractions of the attendance control policy, Hughes engaged in at least two incidents that smack of insubordination. (Smith Dep. at 39–40, 46–47 & Exs. 11, 18–19.) On June 30, 2008, Hughes was reprimanded for failing to give a resident a shower although she was instructed to do so three times. (*Id.* at 39–40 & Ex. 11.) Hughes' write-up did not accuse her of insubordination despite her refusal to follow orders and, moreover, did not show that she received any type of punishment. (*Id.* at 40 & Ex. 11.) In August 2011, Hughes violated Spring Meadows policy by neglecting to check on residents every two hours, ignoring a page, and failing to change a resident's sheets despite the nurse's instruction. (*Id.* at 46–48 & Exs. 18–19.) In September 2011, Hughes received another write-up for finding an employee to cover a shift without approval from her supervisor. (*Id.* at 49 & Ex. 20.).

These three incidents arguably parallel the three incidents memorialized in Foster's file, which includes two write-ups for conduct deemed insubordination and one write-up based on the failure to obtain authorization for a shift replacement. Drawing all inferences in favor of Foster, a reasonable jury could conclude that Hughes' actions on these occasions are comparably serious incidents of insubordination as Foster's infractions. A reasonably jury could also question Spring Meadows' different treatment of Foster and Hughes, who was not deemed insubordinate for her misconduct. Crowe terminated Foster based on repeat incidents of insubordination, yet the record reveals no tangible consequences at all for Hughes' actions. (Smith Dep. at 39–40, 46–47; *compare* Smith Dep. Exs. 11, 18–19 *with id.* Ex. 34.) We leave it to the jury to determine

-16-

whether Foster and Hughes are similarly situated and, if so, what inferences should be drawn from the evidence.[8]  For now, Foster has raised material questions of fact as to the fourth prong of the prima facie case sufficient to warrant a trial on her age and race claims.

## II.    Nondiscriminatory Reason, Pretext, and the Honest Belief Rule

The burden of production shifts now to Spring Meadows to prove that it had a legitimate, nondiscriminatory reason for its decision to terminate Foster's employment.  *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093; *DiCarlo*, 358 F.3d at 414–15; *Tuttle,* 474 F.3d at 317.  We agree with Spring Meadows that it has shown a legitimate reason, i.e., based on its investigation of the October 25, 2009 incident, Foster walked out during a shift without authorization and without informing her supervisors.[9]  (Mem. at 10–11.)

The pendulum swings back to Foster, who must show that Spring Meadows' explanation is nothing but a pretext for discrimination.  *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093; *DiCarlo*, 358 F.3d at 414–15; *Tuttle,* 474 F.3d at 317.  To demonstrate pretext and defeat summary judgment, Foster must demonstrate "(1) that the proffered reasons had no basis *in fact*; (2) that the proffered reasons did not *actually* motivate [her] discharge, or (3) that they were *insufficient* to motivate discharge."  *Manzer v. Diamond Shamrock Chems., Inc.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (internal quotation omitted); *Martin*, 548 F.3d at 412; *Cicero*, 280 F.3d at

_____

[8] Foster contends that Hughes engaged in other misconduct.  For example, Foster claims it was "common knowledge" that Hughes dropped a resident, resulting in the resident's death.  (Resp. at 23.)  Foster also claims that Hughes walked off the job, without punishment.  (*Id.*)  Foster has no personal knowledge of these purported events and relies exclusively on hearsay for support.  (*See* Henderson Dep. at 15, 19–22, 31–32 (testifying as to what other workers told her); Foster Dep. at 107.)  We need not address these unsupported arguments.

[9] Foster does not dispute this point.  (Resp. at 15 (jumping directly into the pretext analysis).)

-17-

589.  Foster attempts all three approaches, but we need address only two of her arguments to dispose of this motion.

## A.      No Basis in Fact

In pursuing this first avenue, Foster must put forth evidence that the bases underlying her termination "never happened, *i.e.*, that they are factually false." *Manzer*, 29 F.3d at 1084; *Abdulnour v. Campbell Soup Supply Co.*, 205 F.3d 496, 502–03 (6th Cir. 2007).  Spring Meadows insists that Foster relies only on her self-serving testimony that she did not walk out without authorization.  But Spring Meadows underestimates the value of Foster's testimony, which we cannot discount, and overlooks other evidence.

In evaluating Foster's challenge to the credibility of Spring Meadow's position, we must consider and credit her evidence.  Foster testified—and Henderson corroborated—that, on October 24, 2009, Adams told Foster that she could leave early the following day if Foster confirmed with Adcock.  (Foster Dep. at 34–38, 53; Henderson Dep. at 7–11.)  Foster did so, and Adcock advised that she could leave early on October 25, 2009 as long as there were no problems.  The record does not indicate that any such problems arose, and Foster testified repeatedly that Spring Meadows needed to send home two CNAs on October 25, 2009, as it had done the prior day.  (Foster Dep. at 28–29, 55, 64–65, 91.)  The record does not elaborate on this factual issue or explain why a drawing became necessary, particularly as that procedure had never been followed before.  A reasonable jury could conclude that Foster's tentative approval from Adams and Adcock took full effect on October 25, 2009 and that the drawing was intended to select a second CNA to leave in addition to Foster.

Foster testified that she did not leave without informing her supervisors, also

-18-

undermining Spring Meadows' theory.  (*See* Smith Dep., Ex. 34 (10/28/09 Employee

Counseling/Disciplinary Mem., where Crowe indicated that "not telling anyone could have

caused residents harm as per state tags . . . ").)  Foster stated that she told Henderson and their

charge nurse, Lambert, that she was leaving prior to clocking out.  (*Id.* at 29–31, 41–42.)

Henderson testified that Foster and Lambert did not argue about her leaving on Sunday.  She

further testified that Lambert acknowledged that Foster would leave early, because Lambert had

overhead the conversation the day before when Adams told Foster that it should be fine to do so.

(Henderson Dep. at 10–11, 24–25.)  A reasonable jury could credit Foster's testimony and

conclude that she did not leave without authority or without informing her supervisors.

### B.      Insufficient to Motivate Discharge

This third type of showing for pretext ordinarily involves evidence that "other employees,

particularly employees not in the protected class, were not fired even though they engaged in

substantially identical conduct to that which the employer contends motivated its discharge of the

plaintiff."  *Manzer*, 29 F.3d at 1084; *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir.

2008); *Hollins v. Atl. Co.*, 188 F.3d 652, 661 (6th Cir. 1999).  In attempting to prove pretext in

this manner, Foster may rely on the same evidence of similarly-situated coworkers that she

presented to make out her prima facie case.  *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 533 (6th

Cir. 2007); *Cicero*, 280 F.3d at 589 (explaining that additional evidence is necessary only for the

second method for showing pretext); *Moore*, 2011WL 2938759, at *7.

As discussed at length above, there are several material questions of fact concerning

Foster's proposed comparators.  Foster's claims that Hughes and Green—both white CNAs

under forty—are similarly situated based on their conduct raise questions that must be resolved at

-19-

trial. "If a jury were to determine that the proposed comparators engaged in comparable wrongdoing, but received lesser sanctions, the jury could also decide that [Foster's] actions did not warrant termination, and that the real reason for [her] termination was" her race and/or age. *Moore*, 2011WL 2938759, at \*7. In short, summary judgment here would be inappropriate given the numerous factual questions raised by Foster's evidence. *See Martin*, 548 F.3d at 414 (stating that although the facts did "not themselves establish discrimination," trial was warranted where "a reasonable jury could find that they suggest pretext").

### C.    Applicability of the Honest Belief Rule

Regardless of the factual questions raised by the record, Spring Meadows argues that it is entitled to summary judgment under the honest belief rule as adopted in the Sixth Circuit. (Mem. at 16–17.) Spring Meadows may succeed unless Foster presents evidence that it "did not honestly believe in the given reason for [her] termination." *Abdulnour*, 205 F.3d at 502; *Martin*, 548 F.3d at 414; *Brathwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001). Under the honest belief rule, a plaintiff cannot establish pretext so long as the employer "made a reasonably informed and considered decision before taking an adverse employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998); *Martin*, 548 F.3d at 414; *Brathwaite*, 258 F.3d at 493–94. Spring Meadows can avail itself of this protection by showing "its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith*, 155 F.3d at 807; *Martin*, 548 F.3d at 414. Although we should not demand perfection of the employer's decisional process, we also will not "blindly assume that an employer's description of its reasons is honest." *Smith*, 155 F.3d at 807.

Spring Meadows contends that its decision making was sound due to Crowe's

investigation and her reasonable reliance on written statements from Adcock, Adams, and Lambert. (Mem. at 16–17.) On the record before us, however, we cannot agree. Foster has presented evidence from which a jury could question the reasonableness of Spring Meadows' investigation and decision-making process. For example, Foster testified that Crowe told her on two occasions that Crowe felt the situation was all a big misunderstanding. (Foster Dep. at 66–68.) If Crowe believed as much (and we must credit Foster's testimony), why did Crowe deem Foster's conduct an act of insubordination and fire her? As mentioned earlier, the October 28, 2009 write-up prepared by Crowe raises related questions about what policy Crowe relied on in making her decision, what aspects of Foster's disciplinary history she considered, and how she concluded that three incidents of insubordination required termination.

Perhaps more importantly, Spring Meadows failed to obtain, or inexplicably discounted, any statement from Henderson. (*See* Henderson Dep. at 12–13 (testifying that no one at Spring Meadows asked her for a statement about the incident at the time Foster was fired).) In her written statement, on which Crowe relied, Lambert reported that Foster told Henderson that she was leaving on October 25, 2009 and that Henderson attempted to stop her. (Foster Dep., Ex. 10.) Crowe was thus plainly on notice, during the course of her investigation, that Henderson witnessed this incident firsthand. Henderson testified that Crowe spoke with her about the incident, but the record does not indicate when that conversation took place. (Henderson Dep. at 32; *see also id.* at 12–13.) Either Crowe simply did not speak with Henderson prior to terminating Foster, or she heard Henderson's version of the events and ignored it. Either way, a jury could fairly conclude that Crowe's investigation was not so reliable, reasonable or thorough as to trigger the honest belief rule. *See Martin*, 548 F.3d at 414 (finding a question of fact as to

-21-

the reasonableness of the employer's inquiry when it failed to ask an eyewitness what happened,

relying instead on other, preferred accounts).

## CONCLUSION

As set forth above, we deny Spring Meadows' motion for summary judgment.

SO ORDERED:

_____
Marvin E. Aspen
United States District Judge

Dated:      Chicago, Illinois
           March 6, 2013